U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed January 8, 2009                                   **United States Bankruptcy Judge**

---

THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE:                              §
                                    §
MD PROMENADE, INC.,                 §        CASE NO. 08-34113-SGJ-7
                                    §
        DEBTOR.                     §

### MEMORANDUM OPINION AND ORDER IMPOSING CONTEMPT SANCTIONS

This memorandum opinion encompasses the court's findings of facts and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. Where appropriate, a finding of fact shall be construed as a conclusion of law and vice versa. The court reserves the right to make further findings of fact and conclusions of law, as it determines necessary.

### FINDINGS OF FACT

**A.  Business of the Debtor.**

MD Promenade, Inc. (the "Debtor") is an entity that, for four-and-a half years, operated the now-defunct Metro Grill

-1-

restaurant (the "Metro Grill") on Knox Street in Dallas, Texas. The Debtor leased the space from which it operated from a landlord known as Knox Street Promenade 07 A, LLC ("Knox Street" or "Landlord"). The Debtor testified that the restaurant earned $1.7 million in sales the first year, and $1.9 million the second year, but sales declined the third year—the Debtor blaming this, at least partially, on insufficient parking space at the facility. The Debtor filed a voluntary Chapter 11 petition on August 19, 2008.

In certain state court litigation between the Debtor and the Landlord prepetition, the Debtor, on August 11, 2008, agreed to vacate and relinquish possession of the leased premises to the Landlord, not later than September 4, 2008. However, the Debtor filed Chapter 11, eight days after this agreement, allegedly to attempt a quick sale of the property—hopefully as a going concern. The Debtor has represented that it utilized a broker (presumably prepetition; no broker was ever retained during the bankruptcy case) to attempt to sell the restaurant business, and the Debtor received a tentative indication of interest for $1 million. However, this prospective sale did not come to fruition. Facing what they perceived to be the imminent termination and loss of the lease space (despite the automatic stay created by the Debtor's bankruptcy filing)—the Debtor's principals, Mark ("Mark") and Dirk ("Dirk") Kelcher (together,

the "Kelcher Brothers"), with the assistance of their parents, their parents' company EDM Associates ("EDM")[1], Master Sign (a company owned by Mark's girlfriend's father's friend), and various day laborers hired from a Sam's Club parking lot, removed vast amounts of items from the leased premises to a variety of locations around the Dallas-Fort Worth metropolitan area. It was the unsupervised, unnoticed, surreptitious, and destructive manner of removal of this property that spawned this contested matter and, specifically, the request for contempt sanctions.

**B.  Removal of Property from the Leased Premises.**

The removal of items from the Metro Grill restaurant space (without notice to any party in the bankruptcy case—not to the Landlord, nor anyone else—and certainly without court permission)[2] began on Labor Day weekend, on Saturday, August 30, 2008, and continued through September 4, 2008. By the time the

---

[1]Mark, Dirk, their parents, and EDM shall occasionally be referred to herein, collectively, as the "Kelcher Parties."

[2]To be clear, the Debtor was completely "under the radar screen" during the first month of its bankruptcy case. It filed a "bare bones" Chapter 11 petition with no schedules or "first day" pleadings. It did not attend its debtor-interview with the U.S. Trustee [doc. no. 17], or attend a section 341 meeting. The Debtor moved to extend its time to file schedules, and then did not file them by the court-extended deadline. The Debtor never moved to employ its counsel who filed the case for a $3,000 retainer [doc. no. 38]. The U.S. Trustee moved to dismiss the case for these various deficiencies and the Debtor (who was, by the time of the dismissal motion, drawn into this contested matter with its Landlord in the bankruptcy court), did not oppose dismissal.

**–3–**

Kelcher Parties and their cohorts were finished, the space was unrecognizable as a restaurant.  In common parlance, the lease space was "trashed."  As described below, not only was all personal property, including kitchen equipment, restaurant furniture, furnishings, and alcohol inventory removed, but even doors, windows, hardware, sinks, toilets, urinals, exterior and interior light fixtures, ceiling tiles, and massive HVAC units were removed (the latter, by crane, from the rooftop).  According to the credible evidence, the removal was executed in a highly destructive manner.

**C.  Part I of the Story, As Revealed at a September 15, 2008 Hearing:  Secured Creditors Allegedly Came and Repossessed Their Collateral Postpetition (and Took it to Irving, Texas).**

The story of how, and by whom, property was removed from the leased premises has evolved, hearing by hearing, in this case, as the testimony of the Debtor's vice president, Mark, has morphed and changed.

On September 15, 2008, this court held a hearing on a Motion to Compel Immediate Rejection of Nonresidential Lease (the "Motion to Compel") filed by Knox Street.  Knox Street asserted that, on September 5, 2008, Knox Street's representative visited the leased premises and discovered substantial damage to the premises.  Mark testified at the September 15, 2008 hearing that "people that [the Debtor] had liens with came and took" the items that were removed from the leased premises, and he did not order

**-4-**

the various items removed from the leased premises.  Transcript of Hearing, Motion to Compel, p. 19, ln. 15.  In other words, Mark testified that secured creditors of the Debtor, post-petition, came to the leased premises and repossessed items, presumably their collateral, in violation of the automatic stay. Mark testified that an entity known as EDM was one such secured creditor, but Mark failed to mention that EDM is an entity owned by his parents.  Mark also testified that Texans Credit Union, which asserted a lien in the restaurant kitchen equipment, came and repossessed its collateral.  Mark said, "I don't know who all – I mean, people came – as soon as we said we were leaving, they came and repoed their equipment."  Transcript of Hearing, Motion to Compel, p. 19, ln. 24-25.

Mark further testified that the equipment was, at the time of the hearing, being stored in a warehouse in Irving, Texas, but he was unsure of the warehouse's location.[3]  When asked about what property he personally might have taken from the leased premises, Mark testified on September 15, 2008, that he took a certain quantity of alcoholic beverages, in order to attempt to comply with the Texas Alcoholic Beverages Commission rules.  He

---

[3]It was revealed at a ***subsequent*** hearing that this Irving, Texas warehouse belonged to EDM (again, the company owned by Mark's parents), but this was not, in fact, the present location of the property.  The present location of the restaurant personal property was a building at 200 North Collette in Dallas, owned by none other than Mark, himself, and his brother Dirk.

**-5-**

also emphatically denied that the Debtor took any fixtures ("We didn't take any of the fixtures." Transcript of Hearing, Motion to Compel, p. 21, ln. 20) or any plumbing fixtures, countertops or wall panels (Transcript of Hearing, Motion to Compel, p. 21, ln. 25).

The September 15, 2008 hearing ended with an agreed order compelling rejection of the lease between Knox Street and the Debtor (the "Agreed Rejection Order"). The Agreed Rejection Order, *inter alia*, granted the Motion to Compel in all respects, ordered immediate surrender of the leased premises to Knox Street, and authorized Knox Street to take such action as Knox Street deemed necessary to protect the leased premises. It also ordered that nothing in the Agreed Rejection Order would be construed to prejudice the rights of the parties to seek any other remedies that may be available to them, at law or in equity.

**D. Part II of the Story, As Revealed at the September 30, 2008 Hearing: Mark Admits Being Present for Two Days of the Move-Out, Reveals that Secured Lender EDM is Owned by His Parents, and Discloses that the Removed Items are Not in Irving, Texas.**

The parties were back before this court on September 30, 2008, on the Emergency Motion for Contempt and for Sanctions for Willful Violation of the Automatic Stay (the "Motion for Contempt") filed by Knox Street, alleging that it was the Debtor and the Kelcher Parties who looted (for lack of a better term) the leased premises, not lien creditors, as told by Mark on

**-6-**

September 15, 2008.

    At the September 30, 2008 hearing, Mr. Marty Kaplinger, with Credit Union Liquidity Services f/k/a Texans Credit Union (the "Credit Union"), testified that his employer did **not** repossess items from the leased premises.  Rather, Mr. Kaplinger testified that, at some point, though he could not remember exactly when, he received a telephone call from Mark that the restaurant was closing.  On or about September 5, 2008, Mr. Kaplinger was informed by the Credit Union's counsel, Mr. Kristian Gluck, that the Credit Union's collateral had been removed by the Kelcher Parties from the leased premises.  Within a couple of weeks thereafter, Mr. Kaplinger contacted the Kelcher Brothers and asked Mark where the Credit Union's collateral was, and Mark told him that the property was at 200 North Collette, Dallas, Texas. Within the two or three weeks preceding the September 30, 2008 hearing, Mr. Kaplinger met Mark on a Friday morning at 200 North Collette to inspect the Credit Union's collateral.  Mr. Kaplinger testified that the Credit Union's collateral was stacked around the building and appeared to be in reasonable condition.  Mr. Kaplinger said he went through the building and did a spot check, but he could not properly check everything because of the way it was stacked.  Mr. Kaplinger represented that he saw wash basins, an ice machine, doors, paneling, and wine racks.  He did not see televisions, toilets, urinals, a walk-in cooler and condenser,

lighting fixtures, decorative ceiling tiles or HVAC units. He did see kitchen countertops and mirrors. The main thing he checked for was the stainless steel kitchen equipment, because that was what the Credit Union believed was its collateral. About the items he did not see, Mr. Kaplinger testified that there was an upstairs portion of the building he did not visit. Mr. Kaplinger believed that the storage facility at 200 North Collette was "adequate." The court found Mr. Kaplinger's testimony to be credible.

Next to testify at the September 30, 2008 hearing was David Aldrich, president of the Landlord's management company. Mr. Aldrich testified that he noticed trailers at the leased premises on September 2, 2008, and walked up and saw tables and chairs grouped in the seating area. He did not proceed farther into the building at that time. Mr. Aldrich briefly spoke with Mark, asked him what was going on, and was told that the Kelcher Brothers and the Debtor were going to be opening a new restaurant in Bedford, Texas. Metro Grill was not operating as a business that day, but the restaurant otherwise looked the same. Mr. Aldrich did not notice any countertops or wall paneling missing. Mr. Aldrich returned mid-morning on September 5, 2008, and saw a large covered trailer attached to a truck on the north side of the building. Mr. Aldrich ran into Dirk, who gave Mr. Aldrich a key to the space and said that they were finished moving out.

Mr. Aldrich noticed that a light fixture had been removed from the outside of the building, and Dirk said that he had removed it because he had paid for it.  Mr. Aldrich then proceeded inside and found the furniture, fixtures, and equipment, as well as a substantial amount of the real property—things that were permanently attached to the building like bathroom sinks, doors, frames, HVAC units, toilets, etc.—had been removed.  Mr. Aldrich returned the following Monday and Tuesday to take photographs of the damage.  Mr. Aldrich testified that substantial repairs to the property were needed: a lot of electrical equipment was taken (lighting, ceiling fans, electrical panels); toilets and urinals were taken; and there was damage on walls from mirrors being removed and from doors and door frames being removed.  Repairs would be needed where windows had been removed from a center courtyard area.  The removal of those windows left the interior of the space exposed to the elements, with only the protection of black plastic bags, which had been taped up where the windows had been.  Most significantly, all of the HVAC units, together with the condensing units (all very expensive items), had been removed from the roof of the building.  The court found Mr. Aldrich's testimony to be credible.

Finally, at the hearing on September 30, 2008, Mark testified again.  After two weeks and a day of reflection since his first testimony on September 15, 2008, Mark told a

substantially different story on September 30. Mark testified for the first time that he was actually present at the move-out for the first couple of days, then he left town. He testified that he knew that EDM (specifically, his father) was there helping move everything. Mark thought that all of the items were, therefore, taken to EDM's warehouse location in Irving, Texas, without illumination as to who owned the warehouse, on September 15. He left town in the early morning on September 4, and returned the following Wednesday. His explanation for his different testimony on September 15 was that he did not anticipate that there would be an issue regarding what had been removed from the restaurant, so he had not been anywhere to view the items, and he did not ask Dirk or their father about the items in advance of the September 15 hearing. Since that time, Mark testified that he had verified what had been removed, and where it had been taken. Nevertheless, the court notes that Mark testified with a measure of authority on September 15, despite his asserted lack of verification of the facts prior to his testimony on that date.

For the first time, Mark testified on September 30 that EDM was his parents' company, which loaned money to the Debtor. Mark testified that EDM received a promissory note, secured by a lien subordinated to the Credit Union's lien. Mark testified that EDM also loaned money to the Debtor to pay the expenses for removing

property from the leased premises. Mark testified that EDM does not have possession of the items, and neither has it sold them. Mark testified that there had been no satisfaction of EDM's debt as a result of the removal of their collateral. Mark corrected his testimony from the September 15 hearing, that the removed items were at the Irving, Texas warehouse owned by EDM, but, rather, were at the 200 North Collette location, confirming Mr. Kaplinger's testimony (but not yet revealing that he and Dirk own the 200 North Collette building—that information was revealed at yet a later hearing). Mark testified that the very expensive HVAC units were too large to fit into the 200 North Collette property, so they were taken to a "secure" storage facility on C.F. Hawn Freeway in south Dallas, at a property owned by a friend of a friend (the address of which he could not provide). Mark also testified on September 30 that he had been under the incorrect assumption, at the September 15 hearing, that the Credit Union had removed items from the leased premises.

Mark disputed the Landlord's position that the items removed from the leased premises are the Landlord's property. (That is, Mark disputed that items installed by the Debtor in the leased premises—like the HVAC units, plumbing fixtures, lighting and electrical fixtures, kitchen equipment, mirrors, doors, windows, and wall panels—became part of the real property, and therefore the Landlord's property, upon termination of the lease.) Mark

-11-

asserted that the Debtor purchased everything in the premises, that the building was an empty shell when they started working on it, and that the Debtor spent at least $2 million on finish-out of the property.  Mark asserted that the Debtor believes that the property that was removed from the leased premises was the Debtor's property, and that the Credit Union has a first lien on it and EDM has a second lien on it.

On October 1, 2008 (on what was supposed to be a second day of hearing on the Motion for Contempt), the parties presented an oral agreement for the return of certain, but not all, of the removed items to the leased premises, and, pursuant to that agreement, on October 9, 2008, the court accepted and signed the Agreed Partial Order Regarding Emergency Motion for Contempt and for Sanctions for Willful Violation of the Automatic Stay (the "Agreed First Turnover Order").  The Agreed First Turnover Order provides that Mark, Dirk, EDM, and the Debtor were to, no later than October 10, 2008, return the following items to the leased premises: (i) all interior doors, frames and hardware; (ii) restroom mirrors; (iii) all plumbing fixtures, including toilets, sinks, and urinals; (iv) kitchen ceiling tiles; (v) exterior lighting fixtures; (vi) eighty or more interior light fixtures; (vii) light bulbs; (viii) a ceiling fan; (xi) seven windows and their frames; and (x) counters in the upstairs restrooms and elsewhere.  Additionally, Mark, Dirk, EDM, and the Debtor were

ordered by this court to return the HVAC units to the rooftop of the leased premises no later than October 10, 2008, and the cost of reinstallation would be addressed at a continued hearing set for October 28, 2008.

**E. Part III of the Story, As Revealed at the October 28, 2008 Hearing: Mark and Dirk (the Debtor's Principals) Orchestrated the Move Out, with the Assistance of their Parents and Secured Creditor EDM.**

Mark's testimony has been a "moving target," and, as a result, often not credible. In the end, the court believes that the testimony elicited at the last hearing on October 28, 2008, finally told the full story of what happened with the removal of items from the leased premises. The October 28 hearing was a further hearing on the Motion for Contempt, to address the Debtor's and Kelcher Parties' compliance or non-compliance with the Agreed First Turnover Order, and to address the Landlord's request for attorney's fees and monetary sanctions for willful violation of the automatic stay.

The items required to be turned over by October 10, 2008, were either not turned over at all (in the case of the expensive, large HVAC units) or were returned with damage, such that the items were unusable. At the October 28 hearing, the court heard from both Mark and Dirk, as well as from Mr. Aldrich.

Specifically, Mark testified that Master Signs (a company owned by his girlfriend's father's friend) was engaged by him to remove the HVAC units from the roof of the leased premises, which

**-13-**

occurred on September 1, 2008. Mark further testified that the HVAC units were moved to Master Signs' fenced location at 5545 Parkdale, Dallas, TX 75227 (not the location owned by a friend of a friend, off C.F. Hawn Freeway in south Dallas, as he had previously testified on September 30). The HVAC units had not been returned, as was ordered by the court after the September 30 hearing, because Master Signs was holding them as bailee until the Kelcher Brothers paid for the services of removing the HVAC units from the leased premises' roof, and for the storage of the units. As earlier mentioned, the items were removed from the leased premises beginning Labor Day weekend and continuing through September 4. EDM and day laborers hired in a Sam's Club parking lot assisted with the move-out.

The court finds, based upon the testimony from all three hearings, that, **at least**, the following items were removed from the leased premises: furniture (tables and chairs, etc.); office furniture and equipment; alcoholic beverages; all interior doors, frames, and hardware; restroom mirrors; all plumbing fixtures, including eleven toilets, ten sinks, and five urinals; kitchen ceiling tiles; kitchen equipment such as sinks, stainless steel countertops, and two mop sinks; exterior lighting fixtures; eighty or more interior light fixtures and light bulbs; a ceiling fan; decorative ceiling tiles; seven windows and their frames; counters in the upstairs restrooms and elsewhere; electrical

**-14-**

panels (at least two); a walk-in cooler door and condenser; and the HVAC units and condensers.[4] Additionally, other personal property of the Debtor was likely removed. At the hearing on October 28, 2008, Mark testified that all of these items were moved to a building owned by the Kelcher Brothers at 200 North Collette in Dallas, Texas. The alcohol/liquor was moved to Mark's home garage, where it apparently remained as of October 28, 2008. And the HVAC units and condensers, as previously noted, were moved to Master Signs' location, where they then remained. The October 28 hearing ended with another order of this court[5] requiring (1) that the removed items previously ordered to be returned to the leased premises pursuant to the Agreed First Turnover Order **actually be** returned to the leased premises, and (2) that the newly appointed Chapter 7 Trustee, Robert Newhouse, be given immediate access to all other property held by the Debtor, as it is, or potentially is, property of the

---

[4]The point the court makes with this list, as gleaned from the evidence, is that the leased premises was entirely cleaned out of every trace of Metro Grill. This list of items removed is not intended to be an exhaustive inventory of items removed, but illustrative. This is not the case of a debtor-in-possession who merely did not leave a leased premises in "broom clean" condition. The evidence was clear that the debtor-in-possession pilfered and ransacked the premises, causing the Landlord extensive damage.

[5]The Second Partial Order Requiring Turn Over of Property in Connection with Emergency Motion for Contempt and for Sanctions for Willful Violation of the Automatic Stay was entered by this court on October 31, 2008.

-15-

bankruptcy estate. With regard to the HVAC units and condensers, they were again ordered to be returned immediately to the roof of the leased premises.[6]

**LEGAL ANALYSIS AND RULING**

**A.** **Summary of Legal Analysis: A Pivotal Issue Underlying Whether the Automatic Stay was Violated is Whether Property of the Estate was Involved.**

The Landlord seeks section 362(k) damages, for willful violation of the automatic stay, from the Debtor, EDM, Mark, and Dirk. As a threshold matter, however, there can technically be no violation of the automatic stay, if property of the estate is not involved.

The purpose of the automatic stay is to "protect the **debtor's** assets, provide temporary relief from creditors, and further ensure equality of distribution among creditors by forestalling a race to the courthouse." *GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir. 1985) (emphasis added). By its terms, the automatic stay forestalls action **against debtors** in bankruptcy, not co-debtors, co-tortfeasors, or other **non-debtors**. *Reliant Energy Services, Inc. v. Enron Canada*

---

[6]A post-trial submission from the Landlord indicated that the HVAC units were finally returned, but it would likely cost at least $20,000 to replace missing parts, repair and reinstall them.

*Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) (emphasis added).[7]

Thus, we have a somewhat paradoxical argument by the Landlord: the Landlord argues that the items removed from and damaged at the leased premises are *its* property by virtue of its Lease with the Debtor. If the damaged/removed items are the property of the Landlord, they are, *ipso facto*, not property of the estate, such that no stay violation occurred (since the damage/removal of the items would not have been an exercise of control over property of the estate pursuant to section 362(a)(3)). If Knox Street's argument that the removed items are Knox Street's property is true, the result would seem to be that Knox Street (a) might have a postpetition claim in this case for conversion and breach of contract damages (that Knox Street could have asserted, and could still assert, in an adversary proceeding and/or a section 503(b) request for allowance of an administrative claim), and (b) may be entitled to a civil contempt/sanction award since the Debtor, EDM, and the Kelcher Brothers failed to comply with the Agreed First Turnover Order.

On the other hand, if the Debtor is correct that the removed

---

[7] The Fifth Circuit has recognized an exception to this general rule and has found that a bankruptcy court may invoke section 362 to protect non-debtor co-defendants where there is such an identity between the debtor and the non-debtor co-defendant that a judgment against the non-debtor would be, in effect, a judgment or finding against the debtor. *Reliant Energy*, 349 F.3d at 825. This is not the situation in the case at bar.

items are property of the Debtor, then this court believes that
EDM, the Kelcher Brothers, and Master Signs have exercised
control over property of the estate in violation of the automatic
stay.  11 U.S.C. § 362(a)(3).  If that is the case, then the
court must first determine whether Knox Street has standing to
raise the stay violation and, assuming the answer is "yes,"
determine whether it is Knox Street or the Debtor's estate, now
in the charge of Trustee Robert Newhouse, that is entitled to
damages for the stay violation (and whether damages would be
available pursuant to section 362(k) or other authority).

The court believes that the answer lies in the middle.  That
is, part of the removed items were part of the realty, permanent
fixtures, such that they were the Landlord's property, and part
of the removed items were property of the estate.

**B.  The Knox Street Lease Sheds Light on What Items Are Property
of the Estate as Opposed to Property of the Landlord.**

The lease, Knox Street's Exhibit 1A, was entered into by
Knox Street's predecessor in interest, Knox Street Promenade,
L.P., and the Debtor, on August 14, 2003 (the "Lease").  The
Lease is signed by Mark on behalf of the Debtor.  Mark
represented repeatedly to this court that the reason items such
as the HVAC units, doors and their frames, plumbing fixtures, and
lighting fixtures were removed, is because they were the
Debtor's, paid for by the Debtor.  But the Lease tells a plainly
different story.

-18-

Section 10.1 of the Lease, which contemplates alterations being made to the leased premises by the Debtor, provides that "[a]ll alterations, additions, improvements and fixtures (including, without limitation, all floor coverings, shelving, display cases, light fixtures, mirrors, equipment, and all heating, ventilation and air conditioning equipment, roof mounted mechanical equipment, water heaters and vent-a-hoods, but excluding Tenant's unattached, readily moveable furniture, trade dress, personalty and office equipment) that may be made or installed by Tenant upon the [leased premises] ***is hereby considered a permanent fixture and shall remain upon and be surrendered with the [leased premises] and become property of the Landlord at the expiration or earlier termination of this lease*** (unless the Landlord requests their removal, in which event Tenant shall remove same and restore the [leased premises] to its original condition, reasonable wear and tear excepted, at Tenant's expense)" (emphasis added). Accordingly, the Lease is exceedingly clear that items like the roof-mounted HVAC units, doors, windows, mirrors, plumbing fixtures, lighting fixtures, and countertops—though installed and purchased by the lessee, the Debtor—became property of the Landlord, upon termination of the Lease. Mark, on behalf of the Debtor, agreed to this provision when he signed the Lease, his testimony to the contrary notwithstanding.

-19-

Next, Exhibit C to the Lease (made part of the Lease, and incorporated by reference, by Section 25.16 of the Lease) is the Construction Allowance to Tenant for Finish-Out (the "Construction Allowance"), signed by Mark and initialed by a Landlord representative. The Construction Allowance describes in detail the work to be done to the space by the Landlord and by the tenant (Debtor). The leased premises was part of a new strip retail and restaurant center. As such, the Lease was entered into prior to the completion of construction of the building. The Construction Allowance generally described that the Landlord would provide an empty shell to the tenant (Debtor), who would then do all finish out, including running water and gas utility lines, installing doors, installing walls, installing insulation, installing flooring, installing lighting, installing HVAC units, painting, and installing electrical wiring and related service panels. *See* Construction Allowance, Article IV, Section D. Pursuant to Article IV, Section G of the Construction Allowance, the Landlord paid to the Debtor a $195,000 Tenant Finish Allowance (as defined in the Construction Allowance) "as a reimbursement for Tenant's construction expenses."[8]

---

[8]Mark asserted in his testimony that certain alleged breaches of the Lease on the part of Knox Street, relating to parking space, somehow invalidated the Lease and the Debtor's obligations under the Lease. However, such assertion is without support, as Section 25.7 of the Lease provides that "[i]f any provision of this Lease should ever be held to be invalid or unenforceable, the validity and enforce ability [sic] of the remaining provisions of this lease shall not be affected

-20-

Section 10.1 of the Lease is unambiguous. Everything the Debtor installed in the leased premises—HVAC units, doors, windows, restroom mirrors, plumbing fixtures, light fixtures, kitchen equipment, wall panels, ceiling panels, shelving—anything that would, essentially, require the use of tools to remove it from the premises, became part of the real property and, thus, became property of the Landlord once installed. Specifically, the court considers that at least the following items, which were removed from the leased premises by the Kelcher Parties, became part of the real property pursuant to the terms of the Lease: all interior doors, frames and hardware; restroom mirrors; all plumbing fixtures, including eleven toilets, ten sinks and five urinals; ceiling tiles; exterior lighting fixtures; eighty or more interior light fixtures; a ceiling fan; seven windows and their frames; counters in upstairs restrooms and possibly elsewhere; electrical panels (at least two); the HVAC units and condensers; and any such other items commonly understood to become part of the real estate once installed (like wiring,

---

thereby." Accordingly, the provisions of the Lease are severable, and the Debtor remained obligated under Section 10.1 of the Lease, despite any alleged invalidation of other parts of the Lease. Mark also alleged that the Debtor (and Mark and Dirk) had spent nearly $2 million finishing out the space, which he implied entitled them to remove items affixed to the real estate. But Mark was aware that the Debtor was given a Tenant Finish Allowance and the amount of the Tenant Finish Allowance. That they chose to spend more than the Tenant Finish Allowance is not grounds for nullifying Section 10.1 of the Lease.

insulation, plumbing, wall coverings and flooring).

## C. The Credit Union's Lien and Subordination of Knox Street's Interest Thereto.

On August 26, 2004, the Debtor entered into a Commercial Loan Agreement and Security Agreement (the "Credit Union Loan") with the Credit Union's predecessor in interest, Texans Commercial Capital, LLC. The Credit Union Loan was in the original principal amount of $140,000 and was evidenced by a UCC Financing Statement, which was filed in the real estate records of Dallas County, Texas on November 23, 2004. The Credit Union's security interest extended to "all F F & E, including but not limited to all furniture, fixtures, restaurant equipment and office equipment purchased for Jaden's Restaurant & Bar.[9] *See* Security Agreement, para. 3. The UCC Financing Statement provided that the financing statement covered "All F F & E, but not limited to, machinery, furniture, fixtures, manufacturing equipment, and equipment, shop equipment, restaurant equipment, office and record keeping equipment, parts and tools located in or used in collection with real property described in Exhibit 'A' attached hereto and made a part of said real property being owned by Knox Street Promenade, L.P." *See* UCC Financing Statement, para. 4. Exhibit A to the UCC Financing Statement contained a legal description of the Knox Street property. At the hearing

---

[9]Mark testified that Jaden's is the prior name of the Metro Grill.

before this court on September 30, 2008, Mr. Kaplinger testified that the balance due on the Credit Union Loan was in the approximate amount of $40,000, principal and interest, plus an additional approximate $13,000 in late fees and attorney's fees.

One additional document makes up the Credit Union Loan package: the Landlord Lien Subordination, as between Knox Street's predecessor in interest (Knox Street Promenade, L.P.) and the Credit Union's predecessor in interest (Texans Commercial Capital, LLC), executed on August 26, 2004.

The Landlord Lien Subordination provided that the Landlord subordinated to the Credit Union any and all statutory, common law, or contractual liens, security interest or other interest that Knox Street might acquire in or on "all personal property, together with accessions, accessories, additions, cash, fittings, increases, insurance benefits and proceeds, parts, products, profits, renewals, rents, replacements, special tools and substitutions, wherever located, whether or not held by a bailee for the benefit of the Debtor." *See* Landlord Lien Subordination, paras. 2 and 5. So, pursuant to the Landlord Lien Subordination, Knox Street's interest (if any) in the personal property discussed above, is subordinated to the Credit Union's interest of approximately $53,000. There may be some ambiguity, although not litigated in this contested matter, regarding the priority of the Landlord's interest versus the Credit Union's interest in

certain items, given the use of the word "fixtures" in the UCC
financing statement. In any event, Mr. Kaplinger testified at
the hearing on September 30, 2008, that, although the Credit
Union had a blanket interest in furniture, fixtures, and
equipment, his main concern was the kitchen equipment and counter
tops (all things he described as "stainless steel"), and this was
not part of what was ordered to be turned over in the Agreed
First Turnover Order.

**D.  With Regard to Landlord's Property, Damages are Available,
But Not Via Section 362(k).**

In the end, the court is left with the conclusion that the
Kelcher Parties removed both property of the estate **and** property
of the Landlord from the leased premises. Removal of property
that became part of the real estate, and therefore became the
property of Knox Street (the "Knox Street Property"), was not a
violation of the automatic stay. It was an affront to Knox
Street. It was undoubtedly a breach of the Lease, and likely
constituted the tort of conversion as to Knox Street's property.
But it was not an exercise of control over property of the
estate, so it was not a stay violation. Accordingly, no one is
entitled to section 362(k) damages for the removal of the Knox
Street Property. Knox Street likely has grounds to assert an
administrative expense claim. And, the court has concluded that
the Landlord is entitled to certain damages for the Kelcher
Parties' contempt of court, pursuant to section 105, which will

be further addressed in Section F. below.

**E.  With Regard to Property of the Estate, Damages are Available for the Kelcher Parties' Stay Violations, but Not Via Section 362(k).  Moreover, though Landlord Has Standing to Raise Stay Violations, Damages Flow to Estate Not Landlord.**

Removal of items that were ***not*** a part of Knox Street's real property—items like tables, chairs, televisions, and the alcohol/liquor and possibly other items—did, indeed, constitute an "act to obtain possession of property of the estate, or of property from the estate, or to exercise control over property of the estate" in violation of the automatic stay, pursuant to section 362(a)(3).  As such, the estate is entitled to damages for this willful violation of the automatic stay.

**1.  Standing of Landlord.**

The Debtor challenges Knox Street's standing to seek redress for violation of the automatic stay.  The Fifth Circuit described one of the beneficial effects of the automatic stay is that it halts the traditional "race to the courthouse" by creditors seeking to collect on debts.  *GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d at 716.[10]  "The purpose of the automatic stay is

---

[10]The Ninth Circuit has characterized this phenomenon as protections of "creditors as a class from the possibility that one creditor will obtain payment on its claims to the detriment of all others."  *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 585 (9th Cir. 1993).  *See also Computer Communications, Inc. v. Codex Corp. (In re Computer Communications, Inc.)*, 824 F.2d 725, 731 (9th Cir. 1987) (the automatic stay was "designed to protect debtors and creditors from piecemeal dismemberment of the debtor's estate").

to protect creditors in a manner consistent with the bankruptcy
goal of equal treatment.  The stay of pre-petition proceedings
enables the bankruptcy court to decide whether it will exercise
its power . . . to establish the validity and amount of claims
against the debtor or allow another court to do so, thereby
preventing 'a chaotic uncontrolled scramble for the debtor's
assets in a variety of uncoordinated proceedings.'" *Hunt v.
Bankers Trust Co.*, 799 F.2d 1060, 1069 (5th Cir. 1986) (quoting
from H.R. Rep. No. 595, 95th Cong. 1st Sess. 340 (1977), U.S. Code
Cong. & Admin. News 1978, p. 5787).  So the automatic stay exists
to protect debtors and creditors alike from prejudicial or
harmful actions taken against property of the estate.

Further, courts have gone on to observe that creditors have
standing under the former section 362(h) (now, section 362(k)) to
seek redress for stay violations.  *In re Int'l Forex of Cal.,
Inc.*, 247 B.R. 284, 290-91 (Bankr. S.D. Cal. 2000).  *See also In
re Bequette*, 184 B.R. 327, 332 (Bankr. S.D. Ill. 1995) ("It is
generally accepted that the remedy of [section 362(k)] extends to
creditors as well as debtors who have sustained injuries from a
violation of the stay.").  In *In re Int'l Forex of Cal., Inc.*,
the debtor was a corporate entity, the creditors were two
individuals and two entities, and the stay violator was the
debtor's principal, who brought a third party complaint against
the debtor in a state court lawsuit (which had been brought by

the two individual and two entity creditors against the principal) in violation of the stay. *In re Int'l Forex of Cal., Inc.*, 184 B.R. at 286-288. The court in *In re Int'l Forex of Cal., Inc.* observed that, to the extent that the creditors were seeking redress of the stay violation as creditors of the estate (rather than as independent third parties), they had standing to bring an action for redress of a stay violation. *Id*. at 292.

Next, in *Barnett Bank of S.E. Ga., N.A. v. Trust Co. Bank of S.E. Ga., N.A. (In re Ring)*, 178 B.R. 570 (Bankr, S.D. Ga. 1995), the court found that a corporate creditor has the standing to seek redress of a stay violation under section 105(a) of the Bankruptcy Code. *Id*. at 577. "Recognizing the standing of a corporate creditor to call a contemptuous violation of the stay to the court's attention when the creditor has suffered injury therefrom is in furtherance of the statutory scheme" of section 362. *Id*.

> Unlike [section 362(k)] and its more limited grant of standing to bring a damage action, there are no 'prudential' considerations arising from any statutory limitation which suggests that a creditor lacks standing to initiate a contempt proceeding. Such an action does not merely assert a third party's rights or a generalized grievance but, rather, seeks to punish an act which does violence to the essential fabric of the Bankruptcy Code, and which has resulted in particularized harm to the complaining creditor.

*Id*.

The Georgia court went on to note that denial of standing to a corporate creditor to initiate contempt proceedings would

suggest (1) that where "neither the debtor nor the trustee has any economic interest in the subject property, a creditor could proceed against the property in violation of the stay with impunity because the one party who has an incentive to complain of the violation (a creditor whose interest in the property has been harmed) [would be] without standing to call the violation to the courts attention"; and (2) that such would create "a facially anomalous result in that, even though a violation of the automatic stay has occurred . . . a creditor who is adversely affected by the action nevertheless is without standing to seek redress in the very forum established to enforce the statute that created the automatic stay." *Id*.  The Georgia bankruptcy court found that, while the corporate creditor had no standing to recover damages under what was the old section 362(h), the creditor did have standing to initiate a civil contempt proceeding and seek redress of its damages.  *Id*. at 577.

The situation in *In re Ring* is similar to the situation before this court.  The Debtor, controlled by Mark and Dirk, would have this court hold that, in effect, only Mark and Dirk may decide, as the principals of the Debtor, whether to pursue the stay violations committed by Mark, Dirk, and EDM.  Such would leave the creditor body without a representative to seek redress of the wrong.  It is a situation somewhat similar in concept to the one in *Louisiana World Exposition v. Federal Ins. Co.*, 858

F.2d 233 (5th Cir. 1988), wherein the Chapter 11 creditors'
committee sought authority to sue officers and directors of the
debtor, over the objection of the debtor itself.  Noting that a
debtor in possession has the duty to collect property of the
estate and to maximize value of the estate, the debtor-in-
possession was "duty bound" to assert the causes of action
against its officers and directors, if doing so would maximize
the value of the estate.  *Id.* at 246.  The Fifth Circuit also
noted that, it is well-settled law that in certain circumstances,
creditors' committees have standing under section 1103(c)(5) and
section 1109(b) to file suit on behalf of a debtor-in-possession
or a trustee.  *Id.* at 247.

At the time Knox Street brought its motion, this case was
still a case under Chapter 11 and section 1109(b) empowered Knox
Street, as creditor, to "raise and . . . appear and be heard on
any issue in a case under" Chapter 11.  11 U.S.C. § 1109(b).
Where the Debtor herein clearly would not pursue contempt
sanctions for violation of its automatic stay by its own
insiders, Knox Street had the standing to complain.  To the
extent any party might argue that Knox Street should have
obtained the court's authority to pursue the stay violation prior
to doing so (and this court does not believe that Knox Street had
any obligation to do so), this court hereby grants Knox Street
such authority to pursue the contemptuous stay violation on the

estate's behalf. Knox Street was damaged by the Kelcher Parties' actions, as was the estate, and Knox Street is the party best situated to seek redress of those wrongs on behalf of itself and the rest of the creditor body, and of the estate.

**2. Estate is Entitled to Damages for the Kelcher Parties' Violation of the Automatic Stay.**

Having determined that Knox Street has standing to pursue sanctions for violation of the automatic stay on behalf of the estate, the court also concludes that it is the estate, now represented by Trustee Robert Newhouse, as a result of the intervening conversion of this case to Chapter 7, which is the appropriate party to receive any award of damages for the stay violation. That is because, as to the property of the estate that was pilfered, it was the estate (and all of the creditors) that were damaged.[11]

**3. Section 362(k) is Not Applicable, But Section 105(a) Permits this Court to Award Damages for Stay Violations.**

First, damages pursuant to section 362(k) are not available. Section 362(k) provides that "an *individual* injured by any willful violation of a stay provided by [section 362] shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages"

---

[11]The court notes that, in addition to the Landlord (and not counting insiders, such as EDM), this estate has a secured equipment lender (the Credit Union), large IRS debt, and well over a million dollars worth of unsecured debt.

-30-

(emphasis added). It is well settled that a corporation is not entitled to recover damages for violation of the automatic stay. *See In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003) (Jones, J.); *In re Freemyer Indus. Pressure, Inc.*, 281 B.R. 262, 268 (Bankr. N.D. Tex. 2002) (Lynn, J.); *First RepublicBank Corp. v. NCNB Texas Nat'l Bank (In re First RepublicBank Corp.)*, 113 B.R. 277, 279 (Bankr. N.D. Tex. 1989) (Felsenthal, J.).[12] Judge Felsenthal, in *First RepublicBank Corp.*, noting that the Bankruptcy Code distinguishes between the term "corporation" and the term "individual," pointed out that "Congress used the restrictive term 'individual' . . . rather than the inclusive term 'person'" such that corporations cannot be awarded costs, fees, and punitive damages pursuant to section 362(k). *Id.*

The court may not award Mr. Newhouse damages pursuant to section 362(k) because, although he is an individual, a natural person, he is acting as the representative of the estate of a debtor **corporation** "and therefore cannot be considered an individual for proposes of" section 362(k). *In re Amberjack Interests, Inc.*, 326 B.R. 379, 386 n. 1 (Bankr. S.D. Tex. 2005) (Bohm, J.).

---

[12]Each of these opinions addresses the pre-BAPCPA section 362(h). With the amendments to the Bankruptcy Code via BAPCPA, the old section 362(h) has been renumbered to section 362(k), but the two provisions are in substance the same.

However, this court may award damages to a corporate debtor (or, in this case, the trustee of the estate of a corporate debtor) *in the form of contempt sanctions in order to enforce this court's civil contempt power pursuant to this court's equitable authority under section 105(a)*. *In re San Angelo Hockey Club, Inc.*, 292 B.R. at 124; *In re Freemyer Indus. Pressure, Inc.*, 281 B.R. at 269; *In re First RepublicBank Corp.*, 113 B.R. 279. "[C]ivil contempt as a sanction may serve to insure compliance with the automatic stay or to compensate [the estate] for losses or damages sustained because of a stay violation." *In re San Angelo Hockey Club, Inc.*, 292 B.R. at 124. "The Fifth Circuit has recognized that a major purpose of civil contempt is to compensate a party for damages sustained as the result of a violation of a court order or injunction. *** The automatic stay is a self-executing injunction, and therefore, for contempt purposes, constitutes an order issuing from the bankruptcy court." *Id*. (internal citations omitted).

To determine whether the Kelcher Parties' conduct constituted a willful violation of the stay, the court must examine whether the Kelcher Parties committed "intentional acts with knowledge of the bankruptcy petition." *In re San Angelo Hockey Club, Inc.*, 292 B.R. at 124. "Specific intent to violate the stay is not required." *Id*. at 125. "Only acts which violate the stay need be intentionally committed." *Id*. A party's "good

-32-

faith belief that he is not violating the stay is not determinative of the willfulness issue." *Id*. Clearly, Mark and Dirk were aware of the filing of the bankruptcy petition, as the Debtor's principals. And Mark testified to EDM's knowledge of the bankruptcy filing. And yet, they intentionally emptied the leased premises of all traces of the Debtor's business, both property that became part of the realty (like the lighting fixtures, doors, and toilets) and property that remained estate property (like furniture, liquor, and other business personal property). The fact that the Kelcher Parties did not think what they did was wrong does not enter into the calculation. They knew the automatic stay existed, and they acted in violation of it.[13]

The court believes, based on three days of testimony, that the Kelcher Parties were acting to protect the creditor-interests of EDM (a company owned by the parents of Mark and Dirk) and to create an opportunity for Mark and/or Dirk to start a new restaurant (outside the bankruptcy process). Mark and Dirk were not acting as prudent fiduciaries, seeking to preserve property of the estate for the benefit of their creditors. Mark and Dirk filed a Chapter 11 case, operated the company for a half-a-month without obtaining any court orders (and without filing required

---

[13]The removal is all the more troubling as Mark testified that they acted without first consulting with their bankruptcy counsel as to whether or not such actions would be appropriate.

bankruptcy paperwork like Schedules), obtained the benefit of an automatic stay to stop the Landlord (and possibly the Credit Union and other creditors) from taking actions, pilfered the restaurant premises so they could start anew somewhere else, did not oppose dismissal of the Debtor's case (when the United States Trustee moved to dismiss for failure to file required paperwork), and would have slipped away with impunity if the Landlord had not filed a motion before this court revealing what was going on when nobody was looking. Debtors-in-possession are not supposed to act this way. Neither are their attorneys supposed to let them.[14]

Accordingly, the court finds that Mark, Dirk, and EDM contemptuously violated the automatic stay. They willfully and recklessly exercised control over property of the estate, not to protect and preserve the property for the benefit of creditors generally, but to protect the interests of insider-secured creditor EDM, and to protect Mark's and Dirk's individual interests. The end result was that any opportunity to maximize value for creditors in the bankruptcy case was destroyed.

This court awards civil contempt damages, as permitted pursuant to section 105(a), in the amount of **$250,000** to Trustee Robert Newhouse, payable jointly and severally by Mark, Dirk, and

---

[14] The Debtor's counsel's conduct and fees are not now before the court. They probably never will be since the court doubts Debtor's counsel will pursue a fee application for her Chapter 11 fees and expenses (small as they probably were).

EDM, within 10 days of the entry of this order. The court has limited hard evidence concerning the possible actual damages to the estate caused by Mark, Dirk, and EDM's actions. However the court does know this: (a) the restaurant grossed $1.7 million its first year, $1.9 million its second year, and something less than that the next two-and-a-half years; (b) the restaurant had a tentative bid from a potential buyer at a sale price of $1 million in August 2008, which was withdrawn, just before Mark, Dirk and EDM looted the restaurant; (c) Mark testified that he and Dirk (and/or the Kelcher Parties) had invested $2 million of tenant finish out in the leased premises; and (d) the Landlord provided the Debtor $195,000 of Tenant Finish Allowance on the premises. This anecdotal evidence convinces the court that much capital had been invested in the restaurant, the restaurant had enjoyed more than a modicum of success, and the restaurant was potentially worth something to someone (either as a going concern or on a liquidation basis). But instead of the bankruptcy trustee having the opportunity to market the property intact, before the Lease was deemed rejected pursuant to section 365, all potential value was lost, and the assets ripped out and diverted to at least three different places. These actions constituted a breach of fiduciary duties and corporate irresponsibility that is reprehensible. Without any more hard evidence of actual damages, the court imposes $250,000 as a sanction for the loss caused to property of the estate that is not easily quantifiable.

**F.  Section 105(a) Sanctions for Contempt of this Court's Agreed First Turnover Order Are Awarded to Knox Street.**

As discussed above, while Knox Street is not entitled to damages for violation of the automatic stay as to *its* property, Knox Street has, nevertheless, been damaged by the contemptuous conduct of Mark, Dirk, the Debtor and EDM in their willful and knowing violation of this court's Agreed First Turnover Order.

"[C]onsideration by a bankruptcy court of a civil contempt motion will encompass only two issues: whether the alleged contemnor knew of the order and whether he complied with it." *Kellogg v. Chester*, 71 B.R. 36, 38 (N.D. Tex. 1987).  "The movant in a civil contempt proceeding must show by clear and convincing evidence that: (1) a court order was in effect; (2) the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the order." *In re LATCL&F, Inc.*, 2001 WL 984912. *3 (N.D. Tex. 2001) (*citing Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 400 (5th Cir. 1987)).  "[T]he factors to be considered in imposing civil contempt sanctions are: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order."  *Lamar Financial Corp. v. Adams*, 918 F.2d 564, 567 (5th Cir. 1990) (*citing United States v. United Mine Workers*, 330 U.S. 258 (1947)).  "To support a finding of

**-36-**

contempt, the moving party must establish that an order of the court was in effect, the defendant knew of the order, and the defendant failed to comply with the order. Civil contempt must be proven by clear and convincing evidence." *Kimco Leasing, Inc. v. Knee*, 144 B.R. 1001, 1009 (N.D. Ind. 1992). "Civil contempt orders serve either or both of two purposes: (1) to compel or coerce obedience of a court order; and (2) to compensate parties for losses resulting from the contemptor's non-compliance with a court order." *In re Gervin*, 337 B.R. 854, 858 (W.D. Tex. 2005) (*citing United States v. United Mine Workers*, 330 U.S. 258 (1947)).

Mark, Dirk, EDM and the Debtor knew of the terms of the Agreed First Turnover Order requiring immediate turn over of certain property as outlined therein. Indeed, Mark, Dirk, EDM and the Debtor agreed to the provisions in the Agreed First Turnover Order, so they were intimately familiar with what was required to be performed under the Agreed First Turnover Order.[15] And yet they, with full knowledge of this court's directives, failed to perform under the Agreed First Turnover Order. The court is mindful that Mark, by his testimony on October 28, 2008, attempted to excuse his, Dirk's, the Debtor's and EDM's conduct in a variety of ways, but the court does not find Mark's excuses

---

[15] Counsel Joyce Lindauer signed the Agreed Partial Sanction Order on behalf of the Debtor, and Counsel Mark H. Ralston signed the Agreed Partial Sanction Order on behalf of Mark, Dirk, and EDM.

credible. Mark's story seems to change as circumstances dictate or permit. What is clear is that Mark, Dirk, the Debtor and EDM agreed to act according to the Agreed First Turnover Order, were ordered by this court to act pursuant to the Agreed First Turnover Order, and then failed, without sufficient excuse, to act as they agreed to and were ordered to do. This is classic contempt of court.

Accordingly, Mark, Dirk, EDM and the Debtor are all in contempt of the Agreed First Turnover Order. Their contempt of this court's order has damaged Knox Street in terms of real property damage, lost opportunity costs, and attorney's fees.

Accordingly, this court, pursuant to section 105(a), awards to Knox Street **$150,000** in contempt damages payable jointly and severally by Mark, Dirk, and EDM to Knox Street within 10 days of the entry of this order.

The basis for this damage award is as follows. Knox originally estimated that it had incurred $180,400 of actual damages, plus $6,155.30 of reasonable attorney's fees, for missing items as follows (THE CAPITALIZED INFORMATION FOLLOWING EACH ITEM SHOWS STATUS OF ITEMS AFTER THE TWO BANKRUPTCY COURT TURNOVER ORDERS):

    1.    Interior doors, frames and hardware (30 doors, all hardware) ($26,000). RETURNED.

    2.    Restroom Mirrors ($1,500). NOT RETURNED.

    3.    Restroom Plumbing Fixtures (11 toilets, 10 sinks, 5 urinals) ($18,000). RETURNED, BUT

**-38-**

TWO ITEMS BROKEN BEYOND REPAIR.

4.    Kitchen Ceiling Tiles ($2,500).  SOME
      RETURNED.

5.    Exterior Light Fixtures ($4,000).  SOME
      RETURNED, BUT ESCUTCHEONS AND COLLARS
      MISSING.

6.    Interior Light Fixtures (80 or more)
      ($20,000).  63 RETURNED WITH 35 DAMAGED
      BEYOND REPAIR. 13 BATHROOM SCONCES AND 16
      OTHER SCONCES NOT RETURNED.  5 EMERGENCY
      LIGHTS NOT RETURNED.  TWO-BY-TWO LAY-IN
      FIXTURES NOT RETURNED.  CAN LIGHTS NOT
      RETURNED. PLUGS NOT RETURNED.

7.    Light Bulbs ($400).  NOT RETURNED.

8.    Decorative Ceiling Tiles ($4,500).  SOME
      RETURNED.

9.    Ceiling Fans ($7,500).  ONE CEILING FAN
      RETURNED.

10.   Mop Sinks (2) ($1,000).  UNCLEAR
      FROM RECORD.[16]

11.   Windows and Frames (12) ($12,500).
      RETURNED WITH DAMAGE.

12.   Electrical Panel ($3,500).  UNCLEAR FROM
      RECORD.[17]

13.   Walk-in Cooler Doors and Condensing
      Units ($15,000).  UNCLEAR FROM
      RECORD.[18]

14.   Counters in Restrooms and Elsewhere

---

[16] Parties may have agreed these items were collateral of
Credit Union.

[17] Parties may have agreed these items were collateral of
Credit Union.

[18] Parties may have agreed these items were collateral of
Credit Union.

($4,000). RETURNED.

15. HVAC Units ($60,000). RETURNED WITH
    DAMAGE AND NOT ALL IN PROPER PLACE.
    KNOX STREET ESTIMATES $20,851.16 OF
    COSTS ASSOCIATED THEREWITH FOR
    ESTIMATES, REINSTALLATION AND REPAIR AND
    REPLACEMENT OF PARTS.

Total Damages $180,400 (plus $6,155.30 for
attorney's fees).

The court believes that some material reduction in damages requested is appropriate, since many items were returned (albeit, many items were damaged). However, the Landlord obviously has been damaged in ways not reflected above, since items will now have to be reattached to put the Landlord back in its original position. For example, the Landlord produced evidence that the $60,000 HVAC units (now returned) will cost $20,851.16 to reinstall and replace parts. The Landlord has no doubt also incurred more attorney's fees since this original evidence was submitted because there have now been three hearings and other activity surrounding this matter in the interim. Making equitable downward adjustments for items returned and upward adjustments for anticipated costs and attorney's fees associated with the Kelcher Parties contemptuous acts and failure to make the Landlord completely whole, the court arrives at $150,000 as a civil contempt sanction that the Kelcher Parties should pay the Landlord.

Based on the foregoing,

**-40-**

    **IT IS ORDERED** that Mark Kelcher, Dirk Kelcher, and EDM Associates, jointly and severally, shall pay to Trustee Robert Newhouse **$250,000** within ten days of the entry of this order.

    **IT IS FURTHER ORDERED** that Mark Kelcher, Dirk Kelcher, and EDM Associates, jointly and severally, shall pay to Knox Street Promenade 07 A, LLC, **$150,000** within ten days of the entry of this order.

                  **\*\*\*END OF MEMORANDUM OPINION AND ORDER\*\*\***